UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CARLOS H. MCKENSI, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>BANK OF AMERICA, N.A., )<br>)<br>Defendant. )<br>) | Civil Action No. 1:09-cv-11940-JGD |

FIRST AMENDED COMPLAINT

1. The Plaintiff, CARLOS H. MCKENSI (hereinafter "MCKENSI") is an individual with a usual place of residence at 7 Neilson Avenue, Everett, County of Middlesex, Commonwealth of Massachusetts.

2. Upon information and belief, the Defendant, BANK OF AMERICA, NA, is a foreign corporation not registered with the Commonwealth of Massachusetts and having a usual place of business at 101 South Tryon Street, Charlotte, North Carolina 28255.

3. The Defendant has subjected itself to the long arm jurisdiction of this Court by having undertaken business and/or transactional business in the Commonwealth of Massachusetts. The Defendant has and continues to utilize the Courts of the Commonwealth of Massachusetts for its purposes and has thereby submitted itself to the long arm jurisdiction of the Courts of the Commonwealth of Massachusetts.

4. The Plaintiff is the owner of a certain property known as and numbered 7 Neilson Avenue, Everett, Massachusetts, hereinafter the "property" or the "premises".

5. On or about June 28, 2006, the Plaintiff entered into a loan arrangement with Mortgage Electronic Registration Systems, Inc., as nominee for SouthStar Funding, LLC, ("Southstar"), whereby SouthStar did loan certain monies to the Plaintiff relative to the premises in question.

6. At the time of the initial loan, both a first mortgage and a second mortgage were entered into.

7. Defendant is attempting to foreclose under the powers contained in the first mortgage executed in favor of SouthStar, claiming it is currently the holder in due course pursuant to an assignment and/or a merger.

8. Traditionally, banks and mortgage companies originated mortgages designed for long-term performance, under conditions where the loan was likely to be repaid, and where there was adequate secured equitable interest in the subject property, because they held the loans over the long term. Upon information and belief, and in contrast to the traditional approach, SouthStar disregarded the underwriting standards, created incentives for loan officers and brokers to disregard the interests of the borrowers and steer them into high-cost loans, and originated countless loans that they knew or should have known the borrowers would be unwilling to pay, all in an effort to increase loan origination volume so as to profit from the practice of packaging and selling the vast majority, if not all, of its loans to the secondary market. In doing so, SouthStar did not have the same interest in ensuring that the loans would be repaid or that foreclosures could be avoided if real estate values stopped rising.

9. In many loans, including Plaintiff's, traditional underwriting standards were abandoned entirely; instead, the loans featured multiple layers of risk with complete disregard to whether the borrowers could afford the loan obligation. These unduly risky loans typically featured what are commonly referred to as "exploding ARMs", i.e., variable interest rates that adjusted upward, usually after two years, causing a significant increase in the borrower's monthly payment. The net effect is that SouthStar routinely closed loans, like the one made the subject of this Complaint, that it knew or should have known the Borrowers could not repay, especially after the "teaser rate" adjusted, and which were doomed to foreclosure.

10. These loans were designed not for long term viability, but for short-term refinancing, and brokers and agents routinely promised, as in this case, that borrowers could refinance before the loan became unaffordable when the introductory rate expired. But this business model, promoting serial refinancing, relied on a perpetual increase in home valuations because many loans were at or near 100% loan to value. As soon as the housing market flattened, SouthStar's already misleading promises of future refinancing became wholly illusory.

11. Upon information and belief, on top of designing and marketing structurally unfair loans to subprime borrowers like Plaintiff, SouthStar's loan origination policies encouraged loan officers and mortgage brokers to steer people into costly loan products, and to originate more loan, to maximize their own compensation. To support applications for the unduly

        risky loans, agents and brokers frequently overstated an applicant's income and/or ability to pay, and inflated the appraised value of the applicant's home. SouthStar, intentionally or recklessly, failed to verify or audit that information, and avoided implementing reasonable measures that would have prevented or limited these fraudulent practices.

12. SouthStar induced homeowners, including Plaintiff, to accept their risky loan products by: (i) failing to clearly and conspicuously disclose how much and how soon the interest rate (and, therefore, the monthly payment) would increase after the teaser rate expired; (ii) failing to clearly and conspicuously disclose whether the stated monthly payments included amounts due for insurance and taxes; (iii) failing to clearly and conspicuously disclose closing fees and costs; (iv) making false promises that SouthStar would refinance the loan prior to the rate increase; and (v) failing to disclose the true costs and risks associated with the false promises that refinancing would be available as an exit strategy when SouthStar's loan became unaffordable after the interest rate adjusted.

13. The Commonwealth and its cities and towns are incurring and will likely continue to incur enormous costs due to SouthStar's unfair, deceptive and predatory loan products. These costs include, but are not limited to, the costs of providing counseling and other assistance to consumers on the verge of foreclosure; the costs of providing additional services to consumers who have lost their homes due to foreclosure; the costs of providing increased law enforcement and emergency services in connection with incidents occurring in and around properties abandoned due to foreclosure; and costs associated with the property value declines caused by foreclosure.

14. The Plaintiffs were induced into obtaining the loan in question, which such loan is in violation of Massachusetts General Laws, Chapter 93A. Applying the criteria established in *Commonwealth of Massachusetts v. Fremont Investment & Loan et al,* 452 Mass. 733 (2008), and later modified in *Commonwealth of Massachusetts v. Option One et al.,* Plaintiffs loan is "presumptively unfair" and "doomed for foreclosure".

15. The Massachusetts courts have uniformly found that loans are "presumptively unfair" when the four following characteristics are present: (1) an adjustable rate mortgage with an introductory period of 3 years or less, (2) an introductory or "teaser" rate at least 2% lower than the fully indexed rate (unless the debt-to-income ratio is 55 percent or above, in which case the difference between the teaser rate and fully indexed rate is not relevant), (3) the Borrowers debt-to-income ratio exceeds 50% if the debt payments were measured at the loan's fully indexed rate; and (4) loan to value ratio is 97% or higher, or the prepayment penalty is substantial or extends beyond the introductory period.

3

16. In this case, (1) the introductory rate was for a period of two years or less[1], (2) the teaser rate was 2% lower than the fully-indexed rate (and/or the debt-to-income ratio was in excess of 55%), (3) the Borrower's DTI exceeded 50% at the fully indexed rate, and the loan amount equaled more than 97% of the fair market value.[2]  Accordingly, this loan was one "doomed for foreclosure" and "presumptively unfair", in violation of Masachusetts General Laws 93A.

17. On or about October 9, 2009, the Plaintiff hired counsel to representing them regarding the pending foreclosure.

18. On October 9, 2009, counsel for the Plaintiff contacted counsel for the Defendant and requested a stay of the foreclosure, citing the various violations of law undertaken by the Plaintiffs in its loan process.

19. In follow up thereto, Plantiffs, through their counsel, on October 14, 2009, made written demand upon the Defendant's agent, Massachusetts General Law 93A, Federal Law and the Regulations of the Attorney General related and enacted pursuant thereto (See Exhibit B).

20. In this request, the Plaintiff's counsel requested Defendant agree voluntarily to stay the foreclosure and that Defendant act in good faith and in a commercially reasonable manner to attempt to modify the mortgages so that the property would not be foreclosed upon, thereby benefiting the borrowers, the lender, the lender's investors and the general public.

21. The Defendant has refused to voluntarily agree to forebear from undertaking the foreclosure.

22. The Plaintiffs, by way of this Complaint, seek to obtain from the Court restraint of the pending foreclosure due to: (a) the loan in question being predatory; (b) the Defendant's failure to act in good faith and in a commercially reasonable manner relative to the this loan; and (c) the Defendant's  violations of Chapter 93A of the Massachusetts General Laws

---

[1] The Adjustable Rate Note was executed on June 28, 2006. See *Adjustable Rate Note,* attached hereto as Exhibit A.  The first payment on the Note was due August 1, 2006.  The first change date occurred two years later, on July 1, 2008.
[2] SouthStar made two loans concurrently.  This was an 80/20 deal, in which the first loan was based on an amount equal to 80% of the fair market value and the second loan was based on 20% of the fair market value.  For purposes of determining whether the loans are "presumptively unfair" and "doomed for foreclosure", the two loans should be treated as one.

# CAUSES OF ACTION

## COUNT I
(Breach of Contract)

23. The Plaintiff reaffirms and re-alleges the allegations contained in paragraphs 1- 22 and incorporates same herein by reference.

24. Plaintiff and Lender entered into a written contract.

25. The contract that the Plaintiff entered into with Lender is an illegal contract in violation of law. Defendant asserts it has been assigned all of Lender's interest in said contract.

26. The acts of the Defendant seeking to enforce an illegal contract constitutes a violation of the law and a breach of the contract.

27. As a result of the Defendant's breach of the contract, the Plaintiff has been caused to suffer damages and injury.

## COUNT II
(Reformation/Declaratory Judgment)

28. Plaintiff reaffirms and re-alleges the allegations contained in paragraphs 1- 27 and incorporate them herein by reference.

29. The Plaintiff borrowed monies from the Lender pursuant to a contract that is illegal and/or unenforceable. Defendant asserts it has been assigned all of Lender's interest in said contract.

30. Due to the illegality and/or unenforceability of the contract, the Plaintiff seeks to have the terms and conditions thereof modified.

31. Plaintiff states that there is a dispute and/or controversy in issue between the Plaintiff and the Defendant regarding the terms and conditions of the illegal and/or unenforceable contract and seek from this Court reformation and/or a declaration of parties' rights and liabilities pursuant to Massachusetts General Laws Chapter 231A, Section 1.

## COUNT III
(Breach of Obligation of Good Faith and Fair Dealing)

32. Plaintiff reaffirms and re-alleges the allegations contained in paragraph 1 - 38 and incorporates them herein by reference.

33. The Plaintiff and the Lender entered into a contract. Defendant asserts it has been assigned all of Lender's interest in said contract.

34. Every contract in Massachusetts has an implied obligation of good faith and fair dealing.

35. The Defendant has violated the obligation of good faith and fair dealing by, among other things, attempting to foreclose on the loan and trying to enforce terms of a contract that are predatory and illegal.

36. The actions of the Defendant have caused Plaintiff to suffer damages and injury.

**WHEREFORE**, the Plaintiff demands as follows:

1. That this Honorable Court issue a Temporary Restraining Order/ Preliminary Injunction restraining and enjoining the Defendant, its attorneys, agents, employees or any other person or entity acting under its direction or control, either directly or indirectly, from foreclosing upon the premises owned by the Plaintiff located at 14 Jackson Street, Lynn, Massachusetts, until further order of this Court.

2. That this Honorable Court enter Judgment in favor of Plaintiffs and against Defendants in such amount the Court deems appropriate and just.

3. That this Honorable Court make a Declaration of rights and liabilities of the parties pursuant to Chapter 231A.

    Respectfully Submitted,
    GALLAGHER & ASSOCIATES, PC
    D/B/A FORBESGALLAGHER
    *Counsel for Plaintiff*
    Tel: (508) 809-6141
    Fax: (508) 377-9483

    /s/ Matthew E. Forbes, Esq.
    Matthew E. Forbes, Esq.
    MA Bar No. 642310
    mforbes@forbesgallagher.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct of the foregoing was filed electronically with the Clerk of the Court using CM/ECF this 8th day of January, 2010.

/s/ Matthew E. Forbes, Esq.
Matthew E. Forbes, Esq.
MA Bar No. 642310
mforbes@forbesgallagher.com

**SERVICE LIST**

PRINCE, LOBEL, GLOVSKY & TYE LLP
*Attorney for Defendant*
100 Cambridge Street, Suite 2200
Boston, MA 02114
Phone: 617 456-8000
Richard E. Briansky, Esq.
BBO# 632709
Joseph P. Calandrelli, Esq.
BBO#666128